**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**CIVIL ACTION FILE NO.: 0:13-CV-62321-RNS-AOV**

PATRICIA GUNSON, on Behalf of Herself
and All Others Similarly Situated,

       Plaintiff,

v.

BMO HARRIS BANK, N.A., FIRST
PREMIER BANK, a South Dakota State-
Chartered Bank, MISSOURI BANK AND
TRUST, a Missouri State-Chartered Bank,
FOUR OAKS BANK & TRUST CO., A North
Carolina Chartered Bank, and MUTUAL OF
OMAHA BANK,

       Defendants.

---

**DEFENDANT MUTUAL OF OMAHA BANK'S MOTION TO COMPEL**
**ARBITRATION AND DISMISS OR, ALTERNATIVELY, STAY LITIGATION AND**
**MEMORANDUM OF LAW IN SUPPORT**

    Defendant Mutual of Omaha Bank ("Mutual of Omaha") respectfully moves this Court,

pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16, for an order compelling Plaintiff

Patricia Gunson ("Plaintiff") to arbitrate each of her claims against Mutual of Omaha in this

action, as well as an order dismissing, or alternatively, staying this action pending arbitration[1]

for the following reasons, as described in more detail in its incorporated Memorandum of Law:

---

[1] Mutual of Omaha relies on this motion to compel arbitration as its responsive pleading. Courts
have repeatedly held that a motion to compel arbitration constitutes a responsive pleading. *See,*
*e.g., Shea v. BBVA Compass Bancshares, Inc.*, 1:12-CV-23324-KMM, 2013 WL 869526, at *2
n.3 (S.D. Fla. Mar. 7, 2013) ("[m]otions to compel arbitration are treated generally as motions to
dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure
12(b)(1).") (citing *Bell v. Atlantic Trucking Co.*, 09-CV-406J32, 2009 WL 4730564, at *2 (M.D.
Fla. Dec. 7, 2009) ("Courts have deemed a motion seeking to compel arbitration as a factual

1.       Plaintiff agreed to arbitrate all disputes arising from or relating to her loan agreement;

2.       The Federal Arbitration Act governs Plaintiff's loan agreement and mandates arbitration of Plaintiff's claims;

3.       Non-signatory Mutual Bank of Omaha may enforce the arbitration agreement through any one of three theories: third-party beneficiary, agency, or equitable estoppel.

I.       **PRELIMINARY STATEMENT**

This dispute belongs in arbitration, not in court.  In bringing this action, Plaintiff ignores the express, written agreement she executed and in which she agreed to arbitrate the claims at issue in this litigation.  Plaintiff attempts to avoid the arbitration agreement she executed by bringing suit against only Mutual of Omaha, who Plaintiff alleges performed the routine banking function of originating ACH transactions from Plaintiff that were initiated by a non-party lender, instead of suing the lender directly.

Plaintiff's attempted end-run around the arbitration agreement fails under the plain language of the agreement she signed.  Plaintiff agreed to arbitrate not only claims directly made against the non-party lender, but also "any dispute [Plaintiff] ha[s] with Lender or anyone else under this Agreement", including "any controversy or claim between [Plaintiff] and Lender, its

---

attack as it asserts that a provision of an extrinsic document, an arbitration clause contained within the body of a contract, deprives the court of its power to adjudicate the plaintiff's claims.")); *Creative Tile Mktg., Inc. v. SICIS Int'l, S.r.L.*, 922 F. Supp. 1534, 1537 n.1 (S.D. Fla. 1996) ("[w]hile a motion to compel arbitration is not included in the ambit of Rule 12(b) motions that suffice as responsive pleadings in lieu of answers, courts traditionally have entertained certain types of pre-answer motions—such as a motion to compel arbitration and stay proceedings—not specifically provided for in the Federal Rules of Civil Procedure.") (citing *Smith v. Pay–Fone Systems, Inc.*, 627 F. Supp. 121, 122 (N.D. Ga. 1985)).  Mutual of Omaha reserves the right to challenge the legal sufficiency of Plaintiff's claims in a separate motion to dismiss if this Motion is denied.

marketing agent, collection agent, any subsequent holder of this Note, or any of their respective agents, affiliates, assigns, [or] employees . . . ." Plaintiff also agreed that the arbitration agreement would be "given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, . . .), based on any legal or equitable theory . . . [including] any claim arising from, related to or based upon . . . the handling or servicing of [Plaintiff's] account . . . ." Moreover, to the extent that Plaintiff attempts to challenge the scope of the arbitration agreement, the plain language of Plaintiff's loan agreement provides that disputes about the scope of the agreement should be decided by the arbitrator, rather than the Court. Finally, the arbitration agreement provided Plaintiff with a 60-day period after Plain Green funded Plaintiff's loan within which Plaintiff could opt out of arbitration. Plaintiff elected not to do so.

Courts routinely require arbitration of claims against non-signatory third parties in exactly these circumstances: where the language of the arbitration agreement covers such third-party claims, or where the claim is intertwined with the very agreement in which the arbitration clause appears. To hold otherwise would permit a party to evade an arbitration agreement by suing another entity performing an ancillary, but essential, duty to the transaction. The Federal Arbitration Act does not authorize this type of end-run around an agreement to arbitrate and for these reasons, Mutual of Omaha respectfully requests that the Court compel arbitration of Plaintiff's claims and dismiss, or alternatively, stay this action.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Plaintiff Agreed To Arbitrate All Claims Relating To Her Loans.

Plaintiff alleges that she "applied for and received multiple payday loans" from Plain Green, LLC ("Plain Green"), a tribal lender entity owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, via Plain Green's website. Compl.¶¶ 17(e), 107.

Plaintiff further admits in the Complaint that "[a]s part of the application process, Plaintiff authorized Plain Green to debit her checking account with JP Morgan Chase Bank in order to repay the loan" (*id.* ¶ 107) and that "[t]o repay the loans, Plain Green initiated frequent debit transactions from Plaintiff's checking account in Florida through the ACH network". *Id.* ¶ 109. Specifically, Plaintiff alleges that on or about May 10, 2013, Plain Green initiated a debit transaction of $119.69 from her checking account by instructing JP Morgan Chase Bank to debit her account; the ODFI that originated that debit instruction was Mutual of Omaha. *Id.* ¶ 110.

Though Plaintiff makes numerous other references to Plain Green and her loans with Plain Green, Plaintiff does not attach any of her loan agreements to the Complaint. A search of Plain Green's records revealed that Plaintiff entered into a total of four loans with Plain Green from 2011 to 2013: (1) a loan for $1,000 effective May 3, 2011; (2) a loan for $550 effective February 23, 2012; (3) a loan for $1,000 effective July 10, 2013; and (4) a loan for $700 effective February 12, 2013 (collectively, the "Loan Agreements"). Declaration of Stefanie H. Jackman in Support of Motion to Compel Arbitration ("Jackman Dec."), Exhibit 1(A) at ¶ 12; *id.* at Exhibit 1(A)(3). [2]

---

[2] The Jackman Dec. is attached hereto as <u>Exhibit A</u>, along with its exhibits, which are as follows:

- <u>Exhibit 1</u> to the Jackman Dec. is a letter from Ms. Jackman to Plaintiff's counsel dated January 7, 2014.
- <u>Exhibit 1(A)</u> to the Jackman Dec. is a Declaration signed by Joel Rosette. Jackman Dec. at ¶ 2.
- <u>Exhibit 1(A)(1)</u> to the Jackman Dec. is a copy of Plain Green's homepage. The Jackman Dec. is attached hereto as "Exhibit A", along with its exhibits. Jackman Dec., Ex. 1(A) at ¶ 6.
- <u>Exhibit 1(A)(2)</u> to the Jackman Dec. is a true and correct copy of Plain Green's "Final Step" pages from its online loan application. Jackman Dec., Ex. 1(A) at ¶ 7.
- <u>Exhibit 1(A)(3)</u> are true and correct copies of the four loan agreements executed between Plaintiff and Plain Green. Jackman Dec., Ex. 1(A) at ¶ 12.

Included within each of the Loan Agreements is an identical arbitration provision (the "Arbitration Agreement").  It begins as follows:

> **PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.**  Unless you exercise your right to opt-out of arbitration . . ., any dispute you have with Lender or anyone else under this Agreement will be resolved by binding arbitration. Arbitration replaces the right to go to court, including the right to have a jury, to engage in discovery . . ., and to participate in a class action or similar proceeding.  In arbitration, a dispute is resolved by an arbitrator instead of a judge or jury.  Arbitration procedures are simpler and more limited than court procedures.  Any arbitration will be limited to addressing your dispute individually and will not be a part of a class-wide or consolidated arbitration proceeding**.**

Jackman Dec., Ex. 1(A)(3) at pp. 6, 17, 28-29, 39 (emphasis in original).[3]  Immediately following this disclosure are the following provisions:

> **Agreement to Arbitrate.**  You agree that any Dispute (defined below) will be resolved by arbitration in accordance with Chippewa Cree tribal law.

> **Arbitration Defined.**  Arbitration is a means of having a third party resolve a Dispute.  A "Dispute" is any controversy or claim between you and Lender, its marketing agent, collection agent, any subsequent holder of this Note, or any of their respective agents, affiliates, assigns, employees . . . . The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, . . .), and regardless of the type of relief sought . . . . A Dispute includes, by way of example and without limitation, any claim arising from, related to or based upon . . . the handling or servicing of your account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan of the Agreement to Arbitrate.

---

Please note that counsel for Mutual of Omaha added the page numbers on Exhibits 1(A)(2) and 1(A)(3) for the Court's convenience.

[3] An identical arbitration provision also appears on the Final Step page in Plain Green's online loan application, which Plaintiff alleges she completed in connection with obtaining her loans from Plain Green.  *See* Jackman Dec., Ex. 1(A)(2) at p. 4; Compl. ¶ 107.

> You acknowledge and agree that by entering into this Arbitration Provision:
>
> **(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**
>
> **(b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**
>
> **(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

Jackman Dec., Ex. 1(A)(3) at pp. 6-7, 17-18, 28-29, 39-40 (emphasis in original).[4]  Thereafter, the Arbitration Agreement reiterates that it applies not just to any claims against Plain Green, but also against any related third parties:

> **Other Provisions.** . . . This Agreement to Arbitrate benefits and is binding upon you, your respective heirs, successors and assigns.  It also benefits and is binding upon us, our successors and assigns, and related third parties.

Jackman Dec., Ex. 1(A)(3) at pp. 8, 19-20, 30-31, 41-42.[5]  Finally, the Arbitration Agreement states that:

> THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE

---

[4] An identical arbitration provision also appears on the Final Step page in Plain Green's online loan application, which Plaintiff alleges she completed in connection with obtaining her loans from Plain Green.  *See* Jackman Dec., Ex. 1(A)(2) at p. 4; Compl. ¶ 107.

[5] An identical arbitration provision also appears on the Final Step page in Plain Green's online loan application, which Plaintiff alleges she completed in connection with obtaining her loans from Plain Green.  *See* Jackman Dec., Ex. 1(A)(2) at p. 5; Compl. ¶ 107.

> GOVERNED BY THE LAW OF THE CHIPPEWA CREE
> TRIBE.

Jackman Dec., Ex. 1(A)(3) at pp. 8, 19, 30, 41 ("Applicable Law and Judicial Review" section);

*see also* Jackman Dec., Ex. 1(A)(2) at p. 4.

In addition, Plaintiff further agreed in the Loan Agreements that: (1) Plaintiff would not

be responsible for paying any filing fees or the costs and fees charged by the arbitrator under any

circumstances, and regardless of which party initiated the arbitration (Jackman Dec., Ex. 1(A)(3)

at pp. 7, 19, 30, 41 ("Cost of Arbitration" section); *see also* Jackman Dec., Ex. 1(A)(2) at p. 4);

and (2) that any arbitration is to be conducted before the American Arbitration Association,

JAMS, or an arbitration organization agreed upon by Plaintiff and the other parties to the dispute.

Jackman Dec., Ex. 1(A)(3) at pp. 7, 18, 29, 40 ("Choice of Arbitrator" section); *see also*

Jackman Dec., Ex. 1(A)(2) at p. 4.

Also included within each of the Loan Agreements is an opt-out clause that allowed

Plaintiff to reject the Arbitration Agreement within 60 days of Plain Green funding her loans.

Jackman Dec., Ex. 1(A)(3) at pp. 6, 17, 28, 39 ("**RIGHT TO OPT OUT**" section) (emphasis in

original); *see also* Jackman Dec., Ex. 1(A)(2) at p. 4.  Plaintiff does not allege that she exercised

this opt-out right, and Plain Green's records do not show that she ever did so.  Jackman Dec., Ex.

1(A) at ¶¶ 14-15.

Finally, at the end of each of the Loan Agreements, directly above the signature section,

it states:

> **This Agreement includes a Waiver of Jury Trial and
> Arbitration Provision that may be enforced by you and us.**  By
> signing this Agreement you agree that it was filled in before you
> did so and that you have received a completed copy of it.  **You
> further agree that you have read and understand all of the
> terms of this Agreement, including the part entitled "Waiver of
> Jury Trial and Arbitration Provision." . . . *By electronically*

> *signing this Agreement . . . You acknowledge, represent and*
> *warrant that (a) you have read, understand, and agree to all of*
> *the terms and conditions of this Agreement, including the*
> *Disclosures and the Arbitration Agreement and Waiver of Jury*
> *Trial.*

Jackman Dec., Ex. 1(A)(3) at pp. 9, 20, 31, 42 (emphasis in original); *see also* Jackman Dec., Ex. 1(A)(2) at p. 5.  Plaintiff electronically signed each of the Loan Agreements.  *See* Jackman Dec., Ex. 1(A)(3) at pp. 10, 21, 32, 43; *see also* Compl. ¶ 107; Jackman Dec., Ex. 1(A) at ¶¶ 7-9, 12.

### B.   Plaintiff Filed This Lawsuit Despite Her Express Agreement To Arbitrate.

Ignoring the Arbitration Agreement set forth in each of the Loan Agreements, on October 23, 2013, Plaintiff filed this putative class action against Mutual of Omaha and various other banks that allegedly originated debit transactions in connection with alleged payday loans initiated by various non-party lenders, including Plain Green.  *See generally* Compl.[6]  Each of Plaintiff's claims is predicated on the allegation that the loans Plaintiff obtained from Plain Green were illegal.  *Id.* ¶¶ 193-195, 205-207 (alleging Mutual of Omaha has participated in the collection of unlawful debts that are unenforceable under Florida state laws against usury); *id.* ¶¶ 214, 226 (alleging Mutual of Omaha "repeatedly and knowingly aided and abetted [Plain Green's] violations of Florida usury laws by causing to be collected usurious interest payments"); *id.* ¶¶ 216, 228, 244 (alleging Mutual of Omaha "knowingly provided substantial assistance to – and profited from – the illegal lending activities of [Plain Green]"); *id.* ¶ 254

---

[6] In her complaint, Plaintiff alleges that Mutual of Omaha violated 18 U.S.C. § 1962(c) (ninth claim for relief), violated 18 U.S.C. § 1962(d) (tenth claim for relief), aided and abetted violations of the Florida Civil Usury Law (eleventh claim for relief), aided and abetted violations of Florida's Criminal Usury Law (twelfth claim for relief), aided and abetted violations of Florida's Deferred Presentment Act (thirteenth claim for relief), and aided and abetted violations of Florida's Deceptive and Unfair Trade Practices Act (fourteenth claim for relief), should be charged with assumpsit (fifteenth claim for relief) and unjust enrichment (sixteenth claim for relief), and that Mutual of Omaha should be permanently enjoined and prohibited from serving as an ODFI for out-of-state pay day lenders and directed to return any funds debited from borrowers' accounts (seventeenth claim for relief).  *See* Compl. ¶¶ 186-273.

(alleging Mutual of Omaha "conspired with and aided and abetted [Plain Green], to make payday loans that were illegal, usurious, and unconscionable under Florida law").  Plaintiff seeks to represent a class defined as those "whose accounts were debited via an ACH entry by . . . Mutual of Omaha Bank . . . on behalf of an Illegal Payday Lender in repayment of a loan which was usurious under Florida law."  *Id.* ¶ 111.

Plaintiff has not sued Plain Green in this case.  Instead, Plaintiff only sued Mutual of Omaha for the routine banking services it allegedly provided to Plain Green by transmitting a single ACH payment in connection with one of Plaintiff's Loan Agreements.  *See id.* ¶ 110.[7]  Plaintiff asserts that, by processing this ACH payment for Plain Green, Mutual of Omaha acted in concert with Plain Green and served as its agent by processing allegedly illegal transactions on Plain Green's behalf.[8]  Specifically, Plaintiff alleges that Mutual of Omaha "participat[ed] in a scheme to access and utilize the [ACH] network to collect unlawful debts."  *Id.* ¶ 1.  Plaintiff further alleges that Mutual of Omaha did this by "working ***on behalf of*** [lenders] to 'originate' ACH entries that represent payday loan credits and debits to and from consumer checking accounts."  *Id.* ¶ 8 (emphasis added); *see also id.* ¶ 9 (alleging that Defendants "know they are acting ***on behalf of*** [lenders] and that the entries they originate on the ACH Network on behalf

---

[7] Given the allegations in the Complaint, it appears that the single ACH transaction involving Mutual of Omaha related to the Loan Agreement with Plain Green that took effect on February 12, 2013.  *See* Jackman Dec., Ex. 1(A)(3) at pp. 34-35 (stating that a payment was due from Plaintiff on May 10, 2013 for $119.69, which comports with Plaintiff's allegations in the Complaint).

[8] According to the Complaint, consumers who wish to make electronic payments, whether for a loan, an electricity bill, or the like, can authorize merchants to initiate Automated Clearing House ("ACH") transactions to debit money directly from their bank accounts.  *See* Compl. ¶ 49.  Here, Plaintiff authorized Plain Green to initiate ACH transactions from her bank account in order to repay her loan.  *Id.* ¶¶ 52, 107.  To accomplish such a request, a lender submits an ACH debit request to a bank (here, Mutual of Omaha) and the bank then submits the transaction to be processed through the ACH network, ultimately resulting in the funds being debited from the customer's account.  Compl. ¶¶ 49-52.

of [lenders] will credit or debit funds in states in which the [lenders'] loans are illegal and unenforceable") (emphasis added); *see also id.* ¶¶ 107-110.   Indeed, Plaintiff repeatedly alleges that the involvement of Mutual of Omaha in this process is essential to the very existence of the transaction she is challenging as illegal.  *See id.* ¶ 7 (stating that "it would be impossible" for payday lenders to deposit loan proceeds or effect debit payments without the Defendants' involvement); *id.* ¶ 46 (Lenders' "scheme could not be accomplished without the complicity of Defendants…."); *id.* ¶¶ 243-245 (alleging that Defendants provided "necessary access" to the ACH network); *id.* ¶¶ 216, 228 ("In making these debits, credits, and transfers, Defendants knowingly provided substantial assistance to – and profited from – the illegal lending activities of the [lenders].").

## III.   ARGUMENT

Plaintiff's claims against Mutual of Omaha are subject to arbitration because they fall within the express language of the broad Arbitration Agreement contained in each of Plaintiff's Loan Agreements.  Consistent with the Federal Arbitration Act's ("FAA") broad arbitration mandate, the Court should order arbitration of Plaintiff's claims and dismiss, or alternatively, stay this case.  Moreover, although Mutual of Omaha is not a signatory to the broad Arbitration Agreements, it is entitled to invoke it under principles of equitable estoppel, as an agent of Plain Green, and as a third-party beneficiary under the Loan Agreements.

### A.   Plaintiff's Claims Are Subject To Arbitration.

#### 1.   Plaintiff's Arbitration Agreement is governed by the FAA because it involves interstate commerce.

As an initial matter, the Loan Agreements are all contracts that involve interstate commerce and which are governed by the FAA, 9 U.S.C. §§ 1-16.  Specifically, Plaintiff's Complaint alleges that the Loan Agreements were performed across state lines between an

Indian reservation in Montana, and Plaintiff, who resides in Florida. Compl. ¶¶ 1-11, 16, 17(e), 33-34, 107-110. In addition, the Complaint alleges that the interstate ACH banking system was used for payments between Plain Green and Plaintiff, which is necessarily interstate activity and governed by federal law, including the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*. *See id*. ¶¶ 1-10; 47-84; 107-110; 186-209; 215-218; 227-230; 244-246. Finally, Plaintiff makes claims under RICO (*see id*. ¶¶ 18, 32-53, 186-209), which could apply only if the transactions Plaintiff complains of occurred in interstate commerce because a RICO claim "is itself grounded in the Commerce Clause." *Florida ex rel. Atty. Gen. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1333 (11th Cir. 2011)*, aff'd in part, rev'd in part on other grounds sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (U.S. 2012); *see also United States v. Maricle*, CRIM. 6:09-16, 2013 WL 5739798, at *2 (E.D. Ky. Oct. 22, 2013) (noting that courts "have consistently upheld RICO as a constitutional exercise of Congress's power under the Commerce Clause. This is because '[f]ederal prohibition of interstate racketeering is clearly within the constitutional delegation of federal power over Commerce among the several States.'") (citing *United States v. Thompson,* 685 F.2d 993, 1001–02 (6th Cir. 1982)). Accordingly, in bringing RICO claims in this lawsuit, Plaintiff implicitly admits that the Loan Agreements involve interstate commerce. Because the Loan Agreements involve interstate commerce, they are governed by the FAA. *Citizens Bank v. Alafabco*, 539 U.S. 52, 55-58 (2003).[9]

---

[9] Moreover, the fact that the Loan Agreements state that they are made pursuant to a transaction involving the Indian Commerce Clause ("ICC") does not change this result. See Jackman Dec., Ex. 1(A)(3) at pp. 8, 19, 30, 41 ("Applicable Law and Judicial Review"). A contract that affects Indian commerce under the ICC can also affect interstate commerce, and therefore, fall within the coverage of the FAA. *See Wisconsin v. Ho-Chunk Nation*, 478 F. Supp. 2d 1093, 1100-01 (W.D. Wis. 2007) *aff'd in part, vacated in part (on other grounds)*, 512 F.3d 921 (7th Cir. 2008) (holding "the FAA applies to permit enforcement of the parties agreement to arbitrate" although it concerns transactions under the ICC); *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Kean–Argovitz Resorts*, 383 F.3d 512, 514 (6th Cir. 2004) (holding casino

        **2.**      **Plaintiff is bound to arbitrate this dispute.**

In the Loan Agreements, Plaintiff agreed to arbitrate "***any dispute*** you have with [Plain Green] ***or anyone else*** under this Agreement. . . ."  Jackman Dec., Ex. 1(A)(3) at pp. 6, 17, 28-29, 39 (emphasis added).  Plaintiff further agreed that:

> A "***Dispute***" is ***any controversy or claim between you and [Plain Green***], its marketing agent, ***collection agent***, any subsequent holder of this Note, ***or any of their respective agents, affiliates, assigns, employees*** . . . . The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands . . . include[ing], by way of example and without limitation, ***any claim arising from, related to or based upon . . . the handling or servicing of your account*** whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan of the Agreement to Arbitrate.

*Id.* at pp. 6-7, 17-18, 28-29, 39-40 (emphasis added).  Plaintiff further agreed that:

> You acknowledge and agree that by entering into this Arbitration Provision:
>
> **(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**
>
> **(b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**
>
> **(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

---

development agreement governed by Indian Gaming Regulatory Act was both Indian Commerce and interstate commerce, and subject to FAA); *see also*, *F.T.C. v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 940 (D.S.D. 2013) ("the 'Indian Commerce Clause' is a grant of Constitutional authority to Congress, and not to any private entity or tribe.").

*Id.* (emphasis in original).

Plaintiff accepted the Arbitration Agreement at two stages in the loan process: first when she completed Plain Green's loan application (*see* Compl. ¶ 107; Jackman Dec., Ex. 1(A) at ¶¶ 7-9, 12), and again when she signed each of the Loan Agreements.  *See* Jackman Dec., Ex. 1(A)(3) at pp. 9, 20, 31, 42.  Specifically, when Plaintiff signed the Loan Agreements, she acknowledged that she had read and agreed to all of the terms therein.  *Id*. ("**This Agreement includes a Waiver of Jury Trial and Arbitration Provision that may be enforced by you and us. . . . You further agree that you have read and understand all of the terms of this Agreement, including the part entitled 'Waiver of Jury Trial and Arbitration Provision.' . . . *By electronically signing this Agreement . . . You acknowledge, represent and warrant that (a) you have read, understand, and agree to all of the terms and conditions of this Agreement, including the Disclosures and the Arbitration Agreement and Waiver of Jury Trial.*"**) (emphasis in original); *accord* 15 U.S.C. § 7001(a)(1) ("[A] signature . . . may not be denied legal effect, validity, or enforceability solely because it is in electronic form."); *Vergara v. Hermosilla v. Coca Cola Co.*, 10-21418-CIV, 2011 WL 744098, at *3 (S.D. Fla. Feb. 23, 2011) *aff'd*, 446 F. App'x 201 (11th Cir. 2011) (same).

Plaintiff also accepted the Arbitration Agreement by accepting and receiving the benefits of the Loan Agreements.  Compl. ¶¶ 107, 109-110; *see*, *e.g*.,  *Sherrod v. Sch. Bd. of Palm Beach Cnty.*, 12-14566, 2013 WL 6727565, at *1 (11th Cir. Dec. 23, 2013) ("[O]nce a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him.") (quoting *Fineberg v. Kline,* 542 So. 2d 1002, 1004 (Fla. Dist. Ct. App. 1988)); *Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1302 (S.D. Fla. 2004) *aff'd*, 470 F.3d 1036 (11th Cir. 2006) (recognizing the principle that

"a party who 'accepts the proceeds and benefits of a contract' remains subject to 'the burdens the contract places upon him.'") (citing *Mazzoni Farms, Inc. v. DuPont*, 761 So. 2d 306, 313 (Fla. 2000)).

Plaintiff also does not allege that she ever exercised her right to opt out of the Arbitration Agreement within 60 days of one of her loans funding under the Loan Agreements, and Plain Green does not have any record of Plaintiff ever doing so.  Jackman Dec., Ex. 1(A) at ¶¶ 14-15. In short, there can be no doubt that Plaintiff entered into a binding arbitration agreement that should be enforced by the Court.

> 3.    **The plain terms of the Arbitration Agreement, which is broadly construed under the FAA and its express terms, covers all of Plaintiff's claims.**

The FAA establishes a public policy that strongly favors the arbitration of disputes and requires courts to enforce arbitration agreements.  *See KPMG v. Cocchi, LLC*, U.S., 132 S. Ct. 23, 25 (2011) ("The Federal Arbitration Act reflects an emphatic federal policy in favor of arbitral dispute resolution.") (citations omitted); *Ivax Corp. v. B. Braun of Am., Inc.,* 286 F.3d 1309, 1315 (11th Cir. 2002).  Section 2 of the FAA provides that a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Section 2 of the FAA further "requires courts to enforce [arbitration] agreements . . . according to their terms." *CompuCredit Corp. v. Greenwood*, 132 S.Ct. 665, 669 (2012) (*citing Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see* 9 U.S.C. § 2. It "is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Section 2 creates "a presumption of arbitrability" and a rule that all "[d]oubts should be resolved in favor of [arbitration]."  *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475

U.S. 643, 650 (1986); *Moses*, 460 U.S. at 24-25.  The presumption in favor of arbitrability is greater when the arbitration clause, as here, is broad.  *See Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003) ("The agreement could not have been broader.  Any disputes means all disputes, because 'any' means all.  And so, of course, does the word 'all' itself. The agreement reaches this dispute because the agreement reaches any and all disputes."). Accordingly, arbitration should be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *United Steelworkers of Am.. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960); *accord Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011) ("The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.") (quoting *Moses H. Cone*, 460 U.S. at 24–25); *see also Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 797-98 (10th Cir. 1995) (noting that the party seeking to avoid arbitration bears the burden of rebutting "the presumption of arbitrability.").

To say the least, the Arbitration Agreement contained in Plaintiff's Loan Agreements is "susceptible of an interpretation that covers the asserted dispute."  For one, its plain language provides that Plaintiff agreed to arbitrate "any dispute" that Plaintiff has with Plain Green "or ***anyone else*** under this Agreement", including Plain Green's "c***ollection agent[s], . . . or any of their respective agents, affiliates***, ***assigns, employees*. . . .*" Jackman Dec., Ex. 1(A)(3) at pp. 6-7, 17-18, 28-29, 39-40 (emphasis added).  The Arbitration Agreement further states that it applies to  "***any claim arising from, related to or based upon . . . the handling or servicing of your account*** whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity,

enforceability, or scope of this loan of the Agreement to Arbitrate." *Id.* (emphasis added). Thereafter, the Arbitration Agreement further states, in all bold, capital letters that Plaintiff agreed to give up specific rights in connection with the Loan Agreement (*i.e.*, her right to a trial by jury, her right to have a court resolve any disputes, and her right to bring a class action) with regard to Plain Green "**OR RELATED THIRD PARTIES**". *Id.* at pp. 6-7, 17-18, 28-29, 39-40 (emphasis in original).

Plaintiff's claims in this action all are expressly predicated on her contention that the Loan Agreements are illegal and therefore, void and unenforceable. *See supra* § II.B; *see also* Compl. ¶¶ 17, 193-195, 205-207, 214-217, 226-229, 243-247, 254, 259, 264-268, 273. In fact, Plaintiff's own allegations show that the claims against Mutual of Omaha are based on: (1) services that Mutual of Omaha provided to Plain Green to effectuate the Loan Agreement; and (2) its role as a purported agent working on behalf of Plain Green. *See* Compl. ¶¶ 1, 8 (alleging that Mutual of Omaha "participat[ed] in a scheme to access and utilize the Automated Clearing House ('ACH') network to collect unlawful debts" and "actively participate[d] in this unlawful scheme by working on behalf of" Plain Green). According to Plaintiff, "it would be impossible" for lenders such as Plain Green to deposit loan proceeds or debit loan payments without Mutual of Omaha's "willingness to allow" Plain Green to access the ACH Network. *Id.* ¶ 7. Plaintiff's own allegations frame Mutual of Omaha as either an agent or servicer of Plain Green, and Plaintiff cannot now evade the Arbitration Agreement prominently and repeatedly disclosed to Plaintiff in each of the Loan Agreements, and which expressly applies to disputes relating to "the handling or servicing of [Plaintiff's] account", as well as any disputes with "related third parties", by suing Mutual of Omaha for the services it provided on Plaintiff's loans. *See*

Jackman Dec., Ex. 1(A)(3) at pp. 6-8, 17-20, 28-31, 39-42 ("**Arbitration Defined**" and "**Other Provisions**" sections).

There is also little doubt that the scope of the Arbitration Agreement is broad.  First of all, the Arbitration Agreement expressly states that the scope of "disputes" subject to arbitration shall be "***given it broadest possible meaning*** and includes, without limitation . . . any claim arising from, related to or based upon . . . the handling or servicing of your account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan of the Agreement to Arbitrate."  *Id*. at pp. 6-7, 17-18, 28-29, 39-40  ("Arbitration Defined" section) (emphasis added).  Moreover, the words "arising from, related to or based upon," when used in an arbitration agreement, are commonly understood to mean that the provision should be read broadly.  *See Moses*, 460 U.S. at 6; Anders, 346 F.3d at 1028; *see also 3-J Hospitality, LLC v. Big Time Design, Inc.*, No. 09-61077, 2009 WL 3586830, at *2 (S.D. Fla. Oct. 27, 2009) (finding that "arising out of or related to" in mediation agreement should be read broadly).[10] Indeed, the FAA requires courts to construe arbitration provisions as broadly as possible and the resolve all issues in favor of arbitration.  *See AT&T Techs.*, 475 U.S. at 650; *Moses*, 460 U.S. at 24-25.  As Plaintiff agreed to arbitrate all claims arising from or relating to the Loan Agreements, including the servicing or handling of the Loan Agreements, and claims against related third parties like Mutual of Omaha, Plaintiff should be compelled to arbitrate her claims in this action.

---

[10] Underscoring the breadth of Plaintiff's Arbitration Agreement is a long, non-exhaustive list of claims and situations that would be subject to arbitration.  Jackman Dec., Ex. 1(A)(3) at pp. 6-7, 17-18, 28-29, 39-40 ("**Arbitration Defined**" section).  The Arbitration Agreement also expressly covers class actions and other representative claims.  *Id*.

**B.**     **Mutual of Omaha Is Entitled To Invoke Plaintiff's Arbitration Agreement.**

To the extent that Plaintiff argues that she is not required to arbitrate her claims against Mutual of Omaha because Mutual of Omaha was not a signatory to the Loan Agreements, this argument fails because courts have long recognized that nonsignatories may invoke such agreements under circumstances like those in the present case.  As the Supreme Court explained in *Arthur Andersen LLP v. Carlisle*, "[b]ecause 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through . . . third-party beneficiary theories, waiver and estoppel," a "litigant who was not a party to the relevant arbitration agreement may invoke [the FAA] if the relevant state contract allows him to enforce the agreement."  556 U.S. 624, 631-32 (2009) (internal quotation omitted); *see also Bolanos v. First Investors Servicing Corp.,* No. 10-23365, 2010 WL 4457347, at *2 (S.D. Fla. Oct. 28, 2010) ("[I]t is well-settled that a nonparty can enforce an arbitration agreement if the language of the agreement is broad enough to permit the nonparty to invoke it.").  "The Eleventh Circuit has enumerated three bases under which non-signatories may be permitted to compel arbitration: (1) equitable estoppel; (2) agency or related principles; and, (3) third-party beneficiary." *AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC,* 608 F. Supp. 2d 1330, 1341 (S.D. Fla. 2009).  All of these bases apply here.[11]

---

[11] "The scope, validity, and enforceability of arbitration agreements, including the right of non-signatories to compel arbitration, is governed by state contract law." *Physician Consortium Servs., LLC v. Molina Healthcare, Inc.*, 414 F. App'x 240, 242 (11th Cir. 2011) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)).  *See also Cappello v. Carnival Corp.*, 12-22181-CIV, 2012 WL 3291844, at *3 (S.D. Fla. Aug. 10, 2012) ("state law governs the applicability of common-law exceptions to enforcement of arbitration agreements"); *FusionStorm, Inc. v. Presidio Networked Solutions, Inc.*, 871 F. Supp. 2d 1345, 1353 (M.D. Fla. 2012) ("In construing arbitration agreements within the scope of the FAA, courts apply general state-law principles of contract interpretation but also afford due regard to the federal policy favoring arbitration.").

### 1.     Plaintiff is equitably estopped from evading the Arbitration Agreement.

A nonsignatory to an arbitration agreement may rely on principles of equitable estoppel to compel a signatory to arbitrate a dispute.  "Equitable estoppel enabling a nonsignatory to invoke an arbitration clause is available in two different circumstances."  *Olsher Metals Corp. v. Olsher*, 01-3212, 2003 WL 25600635, at *8 (S.D. Fla. Mar. 26, 2003) *aff'd*, 90 F. App'x 383 (11th Cir. 2003).  "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause '***must rely on the terms of the written agreement*** in asserting [its] claims' against the nonsignatory."  *Id.* (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)) (emphasis added).  "Second, equitable estoppel is warranted when the signatory raises allegations of substantially ***interdependent and concerted misconduct*** by both the nonsignatory and one or more signatories to the contract."  *Id.* (emphasis added).  Each of these principles of equitable estoppel applies here because: (1) Plaintiff relies on the terms of her Loan Agreements with Plain Green in asserting her claims against Mutual of Omaha; and (2) Plaintiff alleges that Mutual of Omaha and Plain Green, which is a signatory to the Arbitration Agreement, engaged in interdependent and concerted misconduct.

### a.     Reliance on Written Agreement

When evaluating the application of equitable estoppel to arbitration agreements, Florida courts utilize the "reliance" factor set forth by the Eleventh Circuit, holding that equitable estoppel is "warranted when each of the signatory's claims against a non-signatory make reference to or presume the existence of a written agreement."  *Armas v. Prudential Sec., Inc.*, 842 So. 2d 210, 212 (Fla. Dist. Ct. App. 2003) (citing *MS Dealer Service Corp.,* 177 F.3d at 947); *see also id.* (holding that the "purpose of the equitable estoppel doctrine is to prevent a plaintiff from relying on a contract when it works to his advantage and repudiating it when it

works to his disadvantage by requiring arbitration") (citing *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971 (11th Cir. 2002)).

Here, each of Plaintiff's claims against Mutual of Omaha relies on, and arises out of, the terms of the Loan Agreements, which Plaintiff alleges were usurious and resulted in Mutual of Omaha initiating ACH transactions that Mutual of Omaha allegedly knew were improper because they involved allegedly illegal loans.  *E.g.,* Compl. ¶¶ 1-10, 17, 85-89, 107-110. Plaintiff's reliance on the terms of the Loan Agreements in asserting her claims against Mutual of Omaha is similar to the facts of *Armas*, in which the Florida District Court of Appeals found the requirements of equitable estoppel to be met.  *See* 842 So. 2d at 212.  In *Armas*, the court held that a party to an agreement containing an arbitration clause was equitably estopped from avoiding arbitration with a non-signatory to the agreement because its claims stemmed from the same contractual obligations as that underlying its claims against a signatory defendant, which were subject to the  arbitration provision.  *Id.*  The court noted that the party's claims against the non-signatory "arise out of the same factual allegations of concerted conduct by both the non-signatory . . . and the signatories," and concluded that equitable estoppel was warranted to permit the non-signatory to enforce the arbitration provision.  *Id.* ("Non-signatories can also compel arbitration based on the equitable estoppel doctrine" which is warranted "when the signatory to the contract containing the arbitration clause raises allegations of concerted conduct by both the non-signatory and one or more of the signatories to the contract.")  (citing *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999)).

Similarly, here, Plaintiff's claims against Mutual of Omaha all arise under and rely upon the Loan Agreements executed between Plaintiff and Plain Green, and in which Plaintiff expressly consented to arbitrate any and all disputes arising therefrom.  Accordingly, Plaintiff's

claims against Mutual of Omaha all stem from the alleged usurious nature of the loan she obtained from Plain Green, and therefore arise directly from the subject matter of the Loan Agreements with Plain Green.  *See e.g. MS Dealer Serv. Corp.*, 177 F.3d at 948 (granting non-signatory defendant's motion to compel arbitration where plaintiff signatory alleged that the non-signatory and the other signatory engaged in a scheme to defraud plaintiff).

Moreover, Mutual of Omaha's role in processing the repayments of Plaintiff's loans for Plain Green via ACH transfers was expressly set forth in the Loan Agreements.  For one, the Loan Agreement expressly authorized Plain Green to use the ACH network in order to debit Plaintiff's bank account in connection with her loans.  *E.g.,* Jackman Dec., Ex. 1(A)(3) at pp. 3, 14, 25, 36 ("**ACH AUTHORIZATION TO CREDIT BANK ACCOUNT**" and "**ACH AUTHORIZATION TO DEBIT BANK ACCOUNT**" sections) (emphasis in original); *see also, e.g.* Jackman Dec., Ex. 1(A)(2) at p. 2.  In fact, Plaintiff specifically checked a box on each of the Loan Agreements to "authorize . . . ACH debit and credit entries for this loan, . . . [and] agree to the ACH Authorizations set forth in this Agreement."  Jackman Dec., Ex. 1(A)(3) at pp. 9, 21, 32, 43.  The Arbitration Agreement also expressly stated that it applied not only to disputes with Plain Green, but also third parties involved in the "handling or servicing of [Plaintiff's] account . . . ."  *Id.* at pp. 6-7, 17-18, 28-29, 39-40 ("Arbitration Defined" section). Plaintiff's acknowledgment of the role of the ACH network in processing her loan transaction indicates that she understood, or should have understood, that any disputes relating to the use of the ACH network in connection with her Loan Agreements would be subject to arbitration just as any other challenge to the Loan Agreements.  Accordingly, Plaintiff should be equitably estopped from avoiding arbitration.

### b.      Interdependent and Concerted Misconduct.

Florida courts also recognize that while "a non-signatory to a contract containing an arbitration agreement ordinarily cannot compel a signatory to submit to arbitration," courts "have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are ***intertwined*** with the agreement that the estopped party has signed." *Marcus v. Florida Bagels, LLC*, 112 So. 3d 631, 633 (Fla. Dist. Ct. App. 2013) (emphasis added, citations omitted).  The equitable estoppel exception to the general rule is also "warranted when the signatory to the contract containing the arbitration clause raises allegations of *concerted conduct* by both the non-signatory and one or more of the signatories to the contract."  *Id.* at 633-34 (quoting *Shetty v. Palm Beach Radiation Oncology Assocs.– Sunderam K. Shetty, M.D., P.A.*, 915 So. 2d 1233, 1235 (Fla. 4th DCA 2005)) (emphasis added). As the court explained in *Marcus*, the "rationale behind allowing a non-party to an arbitration agreement to use equitable estoppel to compel a party to arbitrate is that otherwise 'the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'"  *Id.* (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)) (alteration in original).

Here, this second independent basis for applying equitable estoppel also is satisfied.  On its face, the Complaint alleges interdependent and concerted misconduct among Plain Green and Mutual of Omaha.  Specifically, Plaintiff alleges that Mutual of Omaha "participat[ed] in a scheme to access and utilize the [ACH] network to collect unlawful debts" (Compl. ¶ 1) and that Mutual of Omaha did this by "working ***on behalf of*** [lenders] to 'originate' ACH entries that represent payday loan credits and debits to and from consumer checking accounts."  Compl. ¶ 8 (emphasis added); *accord id*. ¶ 9 (alleging that Defendants "know they are acting ***on behalf of***

22

Illegal Payday Lenders and that the entries they originate on the ACH Network on behalf of Illegal Payday Lenders will credit or debit funds in states in which the Illegal Payday Lenders' loans are illegal and unenforceable") (emphasis added); *see also id.* ¶¶ 107-110.  Plaintiff even claims that "it would be impossible" for Plain Green to deposit loan proceeds or debit loan payments without Mutual of Omaha's "willingness to allow" it "to access the ACH Network." *Id*. ¶ 7.  Plaintiff further alleges that this Court has jurisdiction over Mutual of Omaha "by virtue of Plaintiff's claims arising from Mutual of Omaha ***making or performing contracts*** . . . ." (*id.* ¶ 34 (emphasis added)) and that Mutual of Omaha "aided and abetted" alleged Florida usury law violations by Plain Green.  *Id*. ¶¶ 211-248 (claims eleven through thirteen); 254 (in connection with count fourteen, alleging that "Defendants repeatedly conspired with and aided and abetted Illegal Payday Lenders, to make payday loans that were illegal, usurious, and unconscionable under Florida law").  There is no doubt that Plaintiff's claims against Mutual of Omaha allege "concerted conduct" between Mutual of Omaha and Plain Green.  Plaintiff's apparent attempt to avoid her obligation under the arbitration clause in the Loan Agreements by naming a nonsignatory, while declining to name the signatory, is precisely what principles of equitable estoppel are designed to prevent, consistent with the "federal policy in favor of arbitration."  *See Marcus*, 112 So. 3d at 633-34.  Plaintiff should be estopped from attempting to avoid her obligation to arbitrate disputes arising under the Loan Agreements by bringing suit against only her payment processor, Mutual of Omaha, rather than her lender, Plain Green.

<blockquote>

**2.     Plaintiff's suit is predicated on her allegation that Mutual of Omaha is an agent of Plain Green.**

</blockquote>

Arbitration is also proper for a second and independent reason: Plaintiff's suit is predicated on the actions that Plaintiff alleges Mutual of Omaha took as an agent "on behalf of" Plain Green.  *See, e.g.*, Compl. ¶¶ 6-9; *see also id.* ¶ 34.  A non-signatory to an arbitration

agreement may compel arbitration where the claims against the non-signatory arise from acts undertaken as agent for the signatory. *See, e.g., Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011) ("a nonparty may force arbitration 'if the relevant state contract law allows him to enforce the agreement' to arbitrate.") (quoting *Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1903 (2009); *Miccosukee Tribe of Indians of Florida v. Cypress*, 12-CV-22439, 2013 WL 2158422, at *3 (S.D. Fla. May 17, 2013) ("Common law principles of contract and agency law allow a signatory to bind a non-signatory to an arbitration agreement.") (quoting *Bd. of Trs. v. Citigroup Global Mkts., Inc.*, 622 F.3d 1335, 1342 (11th Cir. 2010)); *W. Flagler Assocs., Ltd. v. Unite Here Local 355*, 10-20316-CIV, 2012 WL 92766, at *1 (S.D. Fla. Jan. 11, 2012) ("A non-signatory to an arbitration agreement can be bound to the agreement where an agency relationship exists with a signatory and the signatory seeks to bind the non-signatory.") (citing *World Rentals & Sales, LLC v. Volvo Const. Equip't Rents, Inc.*, 517 F.3d 1240, 1244 (11th Cir. 2008)). *See also Betancourt v. Green Tree Servicing, LLC*, 8:13-CV-2759-T-30, 2013 WL 6644560, at *2-3 (M.D. Fla. Dec. 17, 2013) (holding that non-signatory Green Tree could enforce an arbitration provision against a signatory because "Green Tree, as the servicer for the mortgage company, [was] engaged in several aspects of enforcing the  note, and [was] in a relationship with [signatory plaintiff] solely because of the Note,"); *id.* ("Florida courts broadly construe arbitration provisions containing the language, 'arising out of or relating to,' such that the clause may include non-signatories, in certain situations.").

This issue was addressed by the court in *Latifi v. Sousa*, which held that "despite the fact that Sousa is not a party to the contract, he is entitled to compel arbitration" because "plaintiffs' complaint alleges that, during the relevant time period, Sousa was acting as employee and/or agent for [the signatories to the arbitration agreement]," and "[a]gents and employees are bound

under traditional agency law principles." CV95-H-2136, 1996 WL 735260, at *2 (N.D. Ala. Dec. 23, 1996). Moreover, numerous federal courts have concluded that agents of an entity that sign an arbitration agreement are entitled to the protection of their principal's arbitration provision. *See id.* (citing *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1121-22 (3d Cir. 1993) ("[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered"); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement"). As the court explained in *Latifi*, "the availability of arbitration to non-signatory employees also serves the strong federal policy favoring arbitration: it precludes plaintiffs from evading their obligations to arbitrate by suing individuals rather than the signatory entities." 1996 WL 735260, at *2. *See also S. Mills, Inc. v. Nunes*, 1:10-CV-03340, 2011 WL 2358652, at *4 (N.D. Ga. Jun. 9, 2011) ("Precedent holds that agents of a signatory to an arbitration agreement can themselves invoke the signatory's agreement. . . . If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity [ ] themselves.") (citations omitted).

Here, Plaintiff expressly alleges in the Complaint that an agency relationship existed between Mutual of Omaha and Plain Green. *See, e.g.*, Compl. ¶¶ 6-9; *see also id.* ¶ 34. Specifically, Plaintiff contends that Mutual of Omaha "actively participate[d] in this unlawful scheme by working **on behalf of** Illegal Payday Lenders" (*id.* ¶ 8) (emphasis added); that "Defendants know that they are crediting and debiting consumers' accounts for unlawful purposes because they know they are acting **on behalf of** Illegal Payday Lenders and that the entries they originate on the ACH Network **on behalf of** such Illegal Payday Lenders will credit

or debit funds in states in which the Illegal Payday Lenders' loans are illegal and unenforceable" (*id.* ¶ 9) (emphasis added); that "it would be impossible" for Plain Green to deposit loan proceeds or debit loan payments without Mutual of Omaha's "willingness to allow" it "to access the ACH Network" (*id.* ¶ 7); that Mutual of Omaha "repeatedly and knowingly aided and abetted [Plain Green's] violations of Florida usury laws by causing to be collected usurious interest payments" (*id.* ¶ 214); and that Mutual of Omaha "repeatedly conspired with and aided and abetted" Plain Green "to make payday loans that were illegal, usurious, and unconscionable under Florida law." *Id.* ¶ 254.  Plaintiff's claims against Mutual of Omaha are based entirely on the conduct Plaintiff alleges Mutual of Omaha took "***on behalf of***" Plain Green and, as a result, arbitration is proper in this case.

### 3.  Mutual of Omaha is a third-party beneficiary of the Arbitration Agreement.

There is also a third basis to compel arbitration here.  Courts routinely hold that a third-party beneficiary may seek specific performance of an agreement to arbitrate.  *See, e.g., Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1171 (11th Cir. 2011) ("Third-party beneficiaries have standing to enforce contracts intended for their benefit."); *Oravetz v. Halliburton Co.*, 07-20285-CIV, 2007 WL 7067475, at *4 (S.D. Fla. Jul. 24, 2007) (recognizing that "third party beneficiaries to this [arbitration] provision are entitled to invoke, enforce and participate in arbitration pursuant to this provision."); *Razi v. Razavi*, 5:12-CV-80-OC-34, 2013 WL 1193005, at *2 (M.D. Fla. Mar. 22, 2013) ("a non-signatory to a contract may invoke an arbitration clause therein . . .  where the non-signatory is an intended third-party beneficiary of the contract.") (quoting *Liles v. GinnLa West End, Ltd.*, 631 F.3d 1242 , 1256 (11th Cir. 2011).

"To determine whether a party is a third party beneficiary to a contract, a court must review the terms of the contract as a whole" and "should focus on whether the contracting parties

intended that a third party should receive a direct and substantial benefit which might be enforced by the court." *Florida Farm Bureau Ins. Companies v. Pulte Home Corp.*, 8:04-CV-2357, 2005 WL 1345779, at *4 (M.D. Fla. Jun. 6, 2005) (citing *Ken Jenne v. Church & Tower, Inc.,* 814 So. 2d 522, 525 (Fla. 4th DCA 2002)).  Moreover, in showing that an arbitration agreement intended to benefit a third party, it "is not necessary that the third party be specifically named." *Btesh v. City of Maitland, Fla.*, 6:10-CV-71, 2011 WL 3269647, at *41 (M.D. Fla. Jul. 29, 2011) *aff'd*, 471 F. App'x 883 (11th Cir. 2012) (citing *Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd.,* 479 So. 2d 810, 812 (Fla. 3d DCA 1985)).  Rather, it "is sufficient if the claimant is a member of the limited class which was intended to benefit from the contract." *Id.*

Here, it is evident from the face of the Loan Agreements that Mutual of Omaha is an intended beneficiary.  First, the Arbitration Agreement expressly states that it applies to any claims relating to the Loan Agreements to the benefit related third-parties, such as Mutual of Omaha.  *See* Jackman Dec., Ex. 1(A)(3) at pp. 8, 19-20, 30-31, 41-42 ("**Other Provisions**. . . . This Agreement to Arbitrate . . . benefits and is binding upon [Plain Green], [its] successors and assigns, and ***related third parties***.") (emphasis added in part).  The Arbitration Agreement also expressly states that it applies not only to disputes with Plain Green, but also disputes involving the "handling or servicing of [Plaintiff's] account", and those involving Plain Green's "collection agent[s] . . . or any of their respective agents, affiliates, assigns, [or] employees . . . ." *Id.* at pp. 6-7, 17-18, 28-29, 39-40 ("Arbitration Defined" section).

Moreover, the Loan Agreements expressly authorize Plain Green to use the ACH network – which necessarily includes the use an ODFI such as Mutual of Omaha – to credit Plaintiff's bank account with the proceeds of the loans and debit it for repayments on the loans.

*Id.* at pp. 3, 14, 25, 36 ("**ACH AUTHORIZATION TO CREDIT BANK ACCOUNT**" and

"**ACH AUTHORIZATION TO DEBIT BANK ACCOUNT**" sections) (emphasis in original);

*id.* at pp. 9, 21, 32, 43.  Indeed, Plaintiff alleges that Mutual of Omaha acted "on behalf of" Plain

Green and provided services to Plain Green in connection with Plaintiff's loan when it processed

the ACH transactions.  Compl. ¶¶ 6-9; *see also id.* § 34.  Plaintiff also alleges that Mutual of

Omaha "received and retained wrongful benefits from Plaintiff and the Class in the form of such

transaction fees."  Compl. ¶ 266.  It follows, then, that both Plaintiff and Plain Green intended in

the Loan Agreements to confer a benefit upon Mutual of Omaha by authorizing it to process the

alleged ACH transactions in exchange for a fee.

As the Supreme Court has held, arbitration should be ordered "unless it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574,

582-83 (1960).  It is difficult to imagine how the Arbitration Agreement could be anything but

susceptible to the interpretation that it covers claims against third-party service providers, such as

Mutual of Omaha.  Therefore, Mutual of Omaha is entitled to enforce the Arbitration Agreement

contained within the Loan Agreements against Plaintiff as an intended third-party beneficiary.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Mutual of Omaha respectfully requests that the Court grant its

motion to compel arbitration and dismiss this action or, in the alternative, to stay the action

pending the outcome of the arbitration.

## Local Rule 7.1 Certification

I hereby certify that counsel for the movant, Mutual of Omaha Bank, has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

DATED: JANUARY 10, 2014

PETT FURMAN, PL
Attorneys for Mutual of Omaha Bank
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, FL 33431
(561) 994-4311
(561) 982-8985 fax

By:___*s/Wendy L. Furman*_____
     WENDY L. FURMAN
     Fla. Bar No. 0085146
     wfurman@pettfurman.com

BALLARD SPAHR LLP
Christopher J. Willis, *Admitted Pro Hac Vice*
Stefanie H. Jackman, *Admitted Pro Hac Vice*
Ross M. Speier, *Admitted Pro Hac Vice*
999 Peachtree Street, Suite 1000
Atlanta, GA 30309
Telephone: (678) 420-9300
Facsimile: (678) 420-9301
willisc@ballardspahr.com
jackmans@ballardspahr.com
speierr@ballardspahr.com

## CERTIFICATE OF SERVICE

I certify that on January 10, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel on the Court's electronic service list.

___*s/Wendy L. Furman*_____
WENDY L. FURMAN